## Quaker State Oil Refining Company *v.* Talbot, Appellant.

Argued March 20, 1934.   Before FRAZER, C. J., SIMP-
SON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Robert E. Barry,* of *Seymour & Bright,* with him *John
L. Nesbit,* for appellant.—Where an employee, generally
employed to do a class of work and without reference to
any changes or improvements in the tools, implements,
or provisions he is working with, makes an invention,
the employee owns the invention, no matter if made on
the time and with the tools and material of the em-

ployer: Solomons v. U. S., 137 U. S. 342; Gill v. U. S., 160 U. S. 426.

When one has a conception of an invention and employs an assistant to make experiments to demonstrate the practicability of his conception, and such employee makes suggestions which are so original and valuable as to amount to an independent invention, the employee and not the employer is the owner of the invention: Agawam Woolen Mills v. Jordan, 7 Wall. 583; Union Paper Collar Co. v. Van Deusen, 23 Wall. 530.

Plaintiff is not entitled to any license or shop right: United States v. Dubilier Corp., 289 U. S. 178.

*J. Villard Frampton,* with him *Charles R. Fenwick,* of *Mason, Fenwick & Lawrence* and *James H. Courtney,* for appellee.—If the employee is engaged to devise or perfect a particular instrument or a means for accomplishing a prescribed result, all discoveries made by him in connection therewith belong to the employer: Standard Parts Co. v. Peck, 264 U. S. 52; Solomons v. U. S., 137 U. S. 342; Magnetic Mfg. Co. v. Magnetic Co., 16 Fed. 739.

Plaintiff has a shop right or irrevocable license as against the defendant: Gill v. U. S., 160 U. S. 426.

OPINION BY MR. JUSTICE KEPHART, June 30, 1934:

This appeal involves the right of the Quaker State Oil Refining Company to certain mechanical appliances or improvements to prevent the refilling of its oil drums. The oil company claims that Talbot, who devised the invention, was employed by it for that purpose and that it is therefore the owner of the rights which Talbot refuses to assign. This bill was brought to prevent Talbot from selling or attempting to sell his title or interest in the appliances or in any applications covering the improvements made by him and to compel him to assign the legal title to the improvements, or the patent applications therefor, or any patents granted thereon, to the oil

company. A decree was entered as prayed for, and this appeal followed.

The oil company, a corporation, has its principal office in Oil City. For many years it has manufactured, sold, and distributed lubricating oils, grease and similar products. It has, through advertising, developed an extensive business throughout the United States and in foreign countries. The oils which it sells are delivered in drums to which pumps may be attached to withdraw the oil. Appellee for some time had been aware of the fact that unscrupulous persons had been, in its trademarked drums, substituting cheaper and inferior oils for its genuine oils. To eliminate this substitution and protect its trade, and assure its customers a genuine product, appellee had been, prior to the time it had met appellant, investigating various containers of the sealed, nonrefillable type, to prevent this practice. These had all been rejected.

In the course of the investigation, appellee came in contact with W. B. W. Mann, an associate of appellant, Talbot. Mann came to Oil City in August, 1931, to interest appellee in a magnetically operated, nonrefillable drum. He demonstrated this drum to appellee. In this magnetically operated device, the valve housing was permanently attached to a recess in the drum head, the valve was held off its seat by a spring trigger until the drum was filled, after which a magnet was applied to the outside of the drum, to pull the trigger and release the valve. When operated successfully the valve closed the drum against refilling thereafter. This device was rejected because the spring might be released by rough handling before the drum was filled and for additional reasons later stated.

Mann again visited appellee in September, 1931, with a different style of valve for a drum. He demonstrated this to appellee, and it was suggested that he produce a drum containing a valve similar to that shown and demonstrate it to the company. This valve in general, like

the preceding one, showed a "resilient strip" extending over the valve cage and beneath the valve so that, upon pressure being exerted on the top portion, the valve dropped into a closed position. This resilient strip was to hold the valve off its seat during filling, and, when the pressure was exerted and the valve seated, no oil could be introduced into the drum.

This type of valve was objected to and Mann was informed that neither could be adopted. The reasons for the rejection of the two devices was that the drums in each instance provided for but one opening which, when closed against refilling, destroyed the usefulness of the drum, and with it the drum's secondhand or salvage value. This value was essential since the trade would not accept a drum without salvage value, an item of two or three hundred thousand dollars a year to the customers. Therefore, a drum with two openings, one for filling and refilling, and the other for emptying the drum was necessary. This must be so designed that it could not be tampered with without detection.

Both valves show a housing in which is a valve cage, a valve, a valve spring, and a baffle plate to prevent interference, and a light metal tube extending from the housing to a sump at the bottom of the drum. The housing was fixed and permanently attached to a recess in the head of the drum.

About the 16th of December, 1931, Mann, in a last interview to induce appellee to use the "resilient spring valve" with a single opening in the drum, stated to the president of the company, Messer, that he and appellant had exhausted their funds and could not afford to put any more money into the project. Messer instructed Mann to inform Talbot, appellant, that he would take Talbot into his employ, and let him adapt one of his devices to appellee's requirements. That is, to work out a device to preserve its salvage value, appellee required a drum with two openings, one of which would contain simply a one-way valve through which oil could be re-

moved but none inserted, the other hole to be used simply for filling the drum, after which it could be sealed in such a way that any tampering with it would be instantly apparent. In this way after the drum had been emptied of its original contents the seal could be removed and the drum used again. Talbot would be paid a salary and expenses while away from home.

Appellant, as a result of this offer, came to Oil City, December 28, 1931. The next day, in conference with Messer, the objections to Talbot's two appliances were again repeated. Messer explained to appellant exactly what structure or appliance was necessary to be used in the drums, and what was desired. He instructed Talbot to keep in close touch with him so that they might consult together during the progress of the work. Messer impressed on Talbot that the drums must have two openings. With this understanding Talbot proceeded to devise the necessary appliances to adapt to plaintiff's needs the valve which he and Mann had already developed. Appellee had no other purpose for employing Talbot than to do the special work outlined to him.

Appellant began his employment on December 29, 1931, and his salary and expenses were paid by appellee in full, until June 7, 1932, when he was dismissed. During all the time he was so engaged he was continually in touch with the company's officers, consulting with them about his work, submitting it for approval or rejection, and finally he perfected a two-opening device satisfactory to appellee. In the one opening there was placed a special plug and seal for the hole through which the barrel was to be filled and so devised that a gauge stick could be inserted through the plug to determine the amount of oil in the drum. The other hole in the drum was for the purpose of emptying the barrel by means of a one-way valve, described above, but with certain definite improvements in design made later. The first drum was put out about March 25, 1932.

Appellant thereafter arranged for the manufacture of the various parts, and traveled through the country to appellee's warehouses in Cleveland, Detroit, Chicago, St. Louis, and other places, explaining the mechanics of the drum.

Appellee prepared applications for patents covering the structures made by appellant during the course of his employment, and requested appellant to assign the legal title to it. This he refused to do, claiming them as his own.

We are forced to conclude, as did the court below, that an oral contract of employment existed between appellant and appellee, whereby appellant, knowing the requirements of appellee for a suitable, nonrefillable drum for distribution of its lubricants, was to devote his time and skill to solving this problem, and, specifically to adapt his own device or to invent and develop a drum with two openings which would make substitution for the lubricants originally contained therein instantly apparent yet preserve to the trade the salvage value of the drums. The appellant was to be compensated by salary, with a provision for expenses; appellee has fully met its engagement in this respect. Appellant did solve the problem and devised the appliances or improvements. He now claims them as his own, though he accomplished the result while employed and paid by appellee for that specific purpose. May he now assert such claim?

Where an employee by contract is hired to make a particular invention or solve a specific problem for the employer the property in the inventions of the employee belongs to the employer—the employee has sold in advance the fruit of his talent, skill and knowledge, to his employer, who is equitably entitled to it; in making such inventions or solving such problems the employee is merely doing what he was hired to do: Solomons v. U. S., 137 U. S. 342; Gill v. U. S., 160 U. S. 426.

Thus in Standard Parts Co. v. Peck, 264 U. S. 52, defendant was employed to devise an improvement for the

front spring of a Ford automobile. He succeeded, and took out letters patent, claiming the property thereunder. The Supreme Court said: "Whose property was the process and machinery to be developed? The answer would seem to be inevitable and resistless,—of him who engaged the services and paid for them—they being his inducement and compensation, they being not for temporary use but perpetual use, a provision for a business, a facility in it and an asset of it......" This is conclusive of the question of ownership of the improvements or appliances made during the course of employment after December, 1931.

The mere fact that the contract of employment did not provide specifically for the assignment of such devices or improvements is of no moment. Such an engagement was included within the broader sphere of the contract of employment to devise the specific improvement which were afterwards brought out. The plain implication of the relation compels this conclusion: Standard Parts Co. v. Peck, supra. In Goodyear Tire and Rubber Co. v. Miller, 22 Fed. (2d) 353, it was stated: "We are of the opinion not only that plaintiff is entitled to specific performance, but without it it would still be entitled to substantially the same relief by reason of the implications of the primary contract of employment."

The court below did not commit error when it held that all such improvements or devices discovered after December 29, 1931, are the property of the appellee. This conclusion is apparent for many reasons. Appellant brought with him a device intended for a single opening in a drum. What appellant offered and the specific improvements relied on were a "resilient spring" valve and a "trigger" valve; these were operated in a single opening in the drum. Through their use the drums were worthless after they were once filled and emptied. These improvements were not satisfactory. A two-opening drum must be made. It was the combination of the two devices in two openings that fulfilled appellee's require-

ments. The drums placed on the market in March, 1932, with their devices, are vastly dissimilar to the one demonstrated by appellant before December 29, 1931.

The only remaining question would be how much of appellant's idea which had been developed before December 29, 1931, was included in and became a part of the device constructed for appellee, and what right have both parties therein? Whatever defendant had not exhibited to appellee prior to the beginning of his employment must be considered as an improvement or part of the new device. In considering this question there is a part of appellant's combination made before December, 1931,—the valve housing, the valve cage, valve, the baffle plate, down pipe and sump fixed in a single opening— that must be considered. These or parts of these are worked into the structure which is now in use. They are, with modifications later discussed, part of appellant's original idea developed before he started to work. The principles of the Peck Case do not apply to these appliances and appellee claims a shop right therein. Appellant cannot now refuse to permit their use in appellee's applications for patents or refuse to make the necessary assignment to appellee of his right therein for the purpose of securing the patents appellee has applied for. Appellee by the terms of his employment engagment with appellant is entitled to this.

Whether or not appellant is entitled to compensation, and under what terms for the use of these devices by appellee in the production of drums, or whether appellee is entitled to a "shop right" therein, depends somewhat on whether any substantial part of appellant's device was used in the finished product and under what arrangement, and whether it is patentable. His applications for patents prior to December 29, 1931, show, as stated, the valve housing, valve cage, valve, baffle plate, trigger or resilient strip, down pipe and sump. We have described the new appliances in the second opening. We now point out, as suggested above, what appear to be

certain differences in the completed discharge or empty-ing opening of the finished product from the appliances made by appellant before his employment. The finished product does not have the "resilient strip or spring" or "trigger," nor can the barrel be filled through the dis-charge channel. This is a definite change. There are stiffening braces on the cage in the finished product, and the housing of appellee's finished product with the valve structure inside, including the working parts and the baffle, are detachable from the drum head, while appel-lant's housing with the device inside was fastened per-manently and securely to the head of the drum in a recess. In other words, the valve structure is screwed to the bung and braced inside the barrel instead of being permanently a part of the bung.

As stated, this basic idea is present both before and after employment; the one-way valve inside the housing permits the oil to be withdrawn from the drum by means of a pump, the suction lifting the valve from its seat, the oil coming through the down pipe that is suspended from the valve housing. Above this valve head was a baffle to prevent tampering with the valve. Some mention is made of the lock nut on the pump and a valve inside but the evidence shows this is of no value to appellant.

If appellant's appliances are patentable, appellee con-tends it is entitled to their use on the basis of a "shop right"; that the final form of the device was developed at its plant while Talbot was working for it, therefore it is entitled to a free and nonexclusive use of any patent which might result from this labor: see Solomons v. U. S., supra; McAleer v. U. S., 150 U. S. 424; Gill v. U. S., supra; U. S. v. Dubilier Condenser Corp., 289 U. S. 178, 54 Sup. Ct. Rep. 554, 77 L. ed. 1114. The basis of a "shop right" is the invention of a device during em-ployment with the aid of his employer's materials and at his employer's expense.

As stated in U. S. v. Dubilier Condenser Corp., supra, "Recognition of the nature of the act of invention also

defines the limits of the so-called shop right, which, shortly stated, is that where a servant, during his hours of employment, working with his master's materials and appliances, conceives and perfects an invention for which he obtains a patent, he must accord his master a non-exclusive right to practice the invention." Such a rule is based upon equitable principles, for, while the idea belongs to the employee, the financing, so to speak, of its expression in the concrete or practical, is effectuated by the employer; the latter makes usable, at his cost and with his materials and machinery, the invention of the former: McClurg v. Kingsland, 1 How. 202; Solomons v. United States, supra; Lane & Bodley Co. v. Locke, 150 U. S. 193. This principle is also inapplicable under the facts of the instant case, because defendant did not develop these devices after he had been employed by appellee. It follows that as to so much of these appliances, which defendant had developed before he came to Oil City, and which were used in the finished production, appellee is not entitled to a "shop right" therein.

As we view the law, whether appellant is entitled to compensation depends, first, on whether his invention or appliance is patentable when stripped of the essentials here narrated. If it is not, of course it is not necessary for appellee to have a "shop right" and appellant would not be entitled to compensation for the use of such ideas. Patentability is a matter for the federal authorities through its patent office.

However, if it is patentable it does not follow that appellee is without right to that portion of the device which it now employs, which defendant devised before entering its employ. Appellant made them a part of the finished product; they were utilized by him to produce the thing required by appellee and which appellant was paid for producing. The true construction of the arrangement between the parties is that Talbot was to permit the use of these appliances by appellee in the finished product with such further improvement as might

be necessary to complete appellee's insistent demand. Appellant succeeded in making a finished product with the appliances made before December, 1931, in use. Appellee, relying upon the agreement thus made has entered into the manufacture, and is now employing the appliances thus developed for its use. Appellant cannot, therefore, now escape from the contract which he made and refuse to sell and assign to appellee the exclusive use of those parts in the completed device which he had formerly developed. However, if these appliances of appellant made before December, 1931, are patentable, appellee has not paid for these portions of the completed device, nor has it offered to do so. To permit appellee successfully to obtain these structures without payment would be obviously unjust. Equity which has once assumed jurisdiction of a cause will not surrender it until justice has been done. But, before any further steps can be taken in regard to compensation, it must be determined whether appellant's appliances are patentable. The case must therefore be remanded to the court below to await further action, if necessary, to determine the reasonable sum for appellee to pay appellant as compensation for those portions of the device it is now using which appellant developed before December 29, 1931. If these devices should not be patentable, which cannot be determined in this proceeding, appellee may use the appliances regardless of appellant's claim, and until that question is determined appellee may continue to use such appliances under its contract.

We will affirm the decree of the court below, except that part relating to a "shop right." The cause to be remanded and retained for further proceeding, if necessary.

Decree as modified affirmed at appellant's cost.