**TONER v. SOBELMAN et al.**
**Civ. A. No. 6819.**

District Court, E. D. Pennsylvania.
April 6, 1949.

Wilfred R. Lorry and Charles Lakatos (of Freedman, Landy & Lorry), Philadelphia, Pa., for plaintiff.

Samuel B. Fortenbaugh, Jr. (of Clark, Brown, McCown, Fortenbaugh & Young), Philadelphia, Pa., for defendants.

GANEY, District Judge.

In this action based upon defendants' inequitable appropriation of the right to construct and use devices for mechanically trimming or storing grain in ships, and the patent thereof, the plaintiff seeks that the defendants be: (a) declared trustees ex maleficio of the devices, the patent, and all profits and advantages gained by them as a result of their appropriation; (b) required to account for and pay over to him his share in the profits and savings derived from the devices and patent; and (c) directed to reassign the patent to him, or be enjoined from assigning any interest in the patent to anyone other than the plaintiff.

From the evidence presented to it, the court makes the following special findings of fact:

1. The plaintiff is George E. Toner, a citizen of the State of New Jersey, who has been engaged during practically his entire adult life in work connected with loading and unloading of merchant cargo vessels.

2. The defendants are as follows:

(a) Benjamin H. Sobelman, a citizen of the Commonwealth of Pennsylvania, who prior to January 1, 1943, traded as B. H. Sobelman & Co., with his principal office in Philadelphia and did business as steamship agents and stevedores. As of January 1, 1943, Sobelman formed a partnership with Richard P. Ryan, under the name of B. H. Sobelman & Co., to carry on a similar business. Sobelman's interest in the partnership was eighty percent, Ryan's the remaining twenty. Paragraph 4 of the memorandum of partnership agreement provided: "The final decision in all questions arising in the conduct of the partnership shall be made by Sobelman in his sole discretion, including, but not limited to, the establishment and adjustment of drawing accounts and of profit sharing; the addition of new partners and the financing of operations". Prior to and after Ryan's death in September of 1945, other persons were added to the company.

(b) B. H. Sobelman & Co., Inc., a corporation organized and existing under the laws of the Commonwealth of Pennsylvania. It came into existence on January 1, 1947, and took over the business of the company.

(c) Sobelman Enterprises, Inc., a corporation organized and existing under the laws of the Commonwealth of Pennsylvania. It was organized for the purpose of exploiting the mechanical grain trimmers.

3. The matter in controversy, exclusive of interest and costs, exceeds Three Thousand Dollars ($3,000.00).

4. On February 15, 1913, the plaintiff, then thirteen years of age, was employed by Murphy-Cook & Co., contracting stevedores. He subsequently became a stevedore supervisor.

5. Beginning in 1919, because of the labor shortage and the health hazard involved in such employment, it was difficult to obtain men to trim grain on ships. Grain, which is classified as a semi-liquid, includes wheat, corn, rye, oats, barley and linseed.

6. The manual trimming of grain is performed in connecting with the storing of grain in ships. The grain is poured in bulk from the chute of an elevator on shore into the hatch of the ship. The grain, as it falls, forms an ever increasing conical pile in the center of the hold. When the outer surface of the conical pile reaches the coaming or edge of the hatch so that no more can be poured without it overflowing on the deck, the pouring is discontinued. At this point twenty-five or thirty men manually shovel away or distribute the top portion of the conical pile into the furtherest reaches of the hold so that more grain may be poured therein. This process is repeated until the hold is completely filled. It takes forty men at least eight hours to fill a single hold, which number from three to five on a ship. It entails the raising of a volume of dust thereby creating a health hazard. For this reason, longshoremen prefer other work less perilous to health even though the rate of pay is less.

7. Between 1921 and 1925, the plaintiff conceived the novel idea for a device for mechanically trimming grain. Sometime

in 1939 or 1940, with the exception of engineering details which remained to be perfected, he fully developed his idea for the device.

8. Between 1925 and 1940 grain exports dropped to almost nothing. During these years there was no need for a mechanical grain trimmer. As a consequence, plaintiff could not obtain anyone to finance the building of such a mechanical device, which required a fairly large investment. Plaintiff was not in a position financially to transform his idea into reality.

9. Shortly after leaving the employ of Murphy-Cook & Co. on March 15, 1943, and upon being offered employment by Sobelman on behalf of B. H. Sobelman & Co., the plaintiff, on April 16, 1943, accepted the position of assistant manager of the stevedoring department. Under an oral agreement, he was to start at Eighty Five Dollars ($85.00) a week and was required to be on call, in addition to the time spent by him in the office or on the waterfront, at any hour of the day or night. He later became manager of the stevedoring department.

10. Because of his prior experience, he was not instructed as to what his duties were. These included the devising of plans or routines for loading or unloading the ships so that the weight of cargo thereon would be distributed properly at all times; the observing of the ship's trim during the loading or unloading operations in order to forestall a listing and a resulting shift of cargo; the seeing to it that the storing of cargo complied with all the rules and regulations promulgated by the marine underwriters; and the employing of proper and sufficient labor to accomplish these purposes.

11. However, his duties did not include the conducting of experimental work, or the inventing or developing or constructing appliances with the view of ultimately manufacturing devices or machines to aid in loading or discharging cargo vessels.

12. Soon after plaintiff joined B. H. Sobelman & Co., he was divorced almost entirely from grain ships, because his talents were needed to supervise the handling of more cumbersome cargo.

13. Sobelman looked after the executive end of the business and did not concern himself with the details of stevedoring which were left to the plaintiff.

14. In February of 1944, at a time when skilled employees were obtained only at a premium, plaintiff signed a document designated as a "Memorandum of Partnership Agreement". According to this document, which was made retroactive to January 1, 1944, plaintiff was not required to make any capital contributions at the time, and it was contemplated for the year 1944 that he was to receive five percent of the net profits of the business, withdrawals and payments made to him during the year were to be considered as advances, and a signatory could withdraw from the organization upon giving six months notice, or at any time upon the unanimous consent of the remaining members. Paragraph 6 of the memorandum provided: "During the continuance of the partnership, each of the signatories agree to devote himself faithfully and exclusively to the conduct of the business and to behave in all matters with temperate and becoming demeanor". Paragraph 7 stated: "Nothing herein shall be construed to limit or amend the powers of control for the operation of the partnership as set forth in Paragraph Four of the original partnership agreement (see Paragraph 2(a) supra), and the provisions thereof are adopted by the four signatory partners as constituted herein".

15. In the summer of 1944, at a time when exporting of grain had increased and men who were willing to manually trim grain on ships were difficult or almost impossible to obtain, the plaintiff suggested to Sobelman that while working for Murphy-Cook & Co., he had conceived the idea of a device for mechanically trimming grain. After he had outlined the highlights of the device and had explained how it would drastically lessen the number of men needed to load a ship with grain, and had mentioned the fact that it would be profitable for both of them, Sobelman,

doubtful of its practicability told the plaintiff to work on it with the thought of having it manufactured.

16. Plaintiff submitted drawings, prepared by him at his home, to Sprout, Waldron & Co., manufacturing engineers in Muncy, Pennsylvania, which agreed to make the blueprints and supply some practical engineering details. The company did not promise to build the device at that time because of priority regulations then in effect and a backlog of orders.

17. The blue prints were not completed until March of 1945 when they were sent to B. H. Sobelman & Company's principal office. After plaintiff showed them to Sobelman and told him that he approved them, Sobelman directed plaintiff to go ahead and get the device made.

18. About this time plaintiff mentioned to Sobelman that they ought to enter into some definite agreement so that their respective interests in the device would be protected. The latter brushed the suggestion aside and told plaintiff to get the device made and not to worry about a definite agreement for he would talk about that later.

19. Later, plaintiff proposed that they form a company to exploit the grain trimmer. In response to this proposal, Sobelman reminded him that the manufacturing of the device and putting it into operation would require a large outlay of capital and that he (plaintiff) was unknown in financial circles, that there was a problem of obtaining a priority for its manufacture, and that, moreover, 'he was not sure whether it would be a success. In addition to reminding him again that his interest was protected, but could not decide then on the amount of that interest, he suggested that before they worked out a definite agreement it was better to wait and see how the first model responded in actual operation, and for the time being he would handle the matter.

20. After Sobelman stated that they ought to have the idea for the mechanical grain trimmer patented, plaintiff went to Washington, D. C., to consult a patent attorney, retained by Sobelman, relative to the filing of an application for letters patent.

21. Subsequently on November 7, 1945, he received a letter from the patent attorney with an application for him to sign for letters patent in the name of the plaintiff as the inventor. The letter stated that if it were plaintiff's intent to assign the application to the company, the patent attorney would be glad to prepare an assignment and forward it for execution so that it might be recorded in the Patent Office.

22. When Sobelman suggested that he ought to execute an assignment, plaintiff replied that he would not do so until they arrived at an agreement defining what their respective interests were to be, and added that he thought they should be at least fifty percent. Sobelman could not agree on this division of interest.

23. Later plaintiff signed the application for letters patent and sent it to the patent attorney, retained by Sobelman, in Washington, D. C. The attorney, on account of his not receiving any information from the plaintiff concerning the assignment, held up, for some unknown reason, the filing of the application in the Patent Office.

24. As time passed, Sobelman again brought up the subject of the assignment and stated to plaintiff that if he thought for a minute that he (Sobelman) was trying to take advantage of or defraud him, he should engage an attorney. Plaintiff replied that if he were honest and sincere in the matter as he claimed to be, he (plaintiff) didn't need an attorney.

25. Since plaintiff was willing to transfer a half interest in the invention to Sobelman conditioned upon his receiving fifty percent of the profits and savings to be derived from its use, he communicated with the patent attorney in Washington, D. C., and instructed him to prepare an assignment to Sobelman on that basis.

26. On November 23, 1945, in accordance with a previous arrangement, plaintiff and Sobelman met at the patent attorney's office in Washington, D. C. When the assignment on a fifty-fifty basis pre-

pared by the attorney was shown to him, Sobelman displayed surprise and dissatisfaction. He again told plaintiff that his interest in the invention would be protected, but with the patent in his (Sobelman's) name, the grain trimmer could be built and put to use much sooner than if it were in plaintiff's name. Desiring not to be an impediment in the progress of the manufacture of the grain trimmer, the plaintiff, for the purpose of what he thought would expedite matters and in reliance upon Sobelman's reassurance that his interest in the invention would be protected and that if the device developed into a money maker, he (plaintiff) would participate in the profits, signed a document entitled "Assignment", which on its face gave Sobelman, without any restrictions or conditions, the exclusive right to (a) the improvement made in the mechanical grain trimmer and (b) the application, 'for which he was about to file, for letters patent.

27. The document, prepared by the attorney, provided:

"Whereas I, George E. Toner, * * * have invented a certain improvement in Grain Trimmers, *for which I am about to make application for letters patent of the United States,* and whereas Benjamin H. Sobelman, * * * is desirous of acquiring said invention:

"Now, therefore, in consideration of Ten ($10.00) Dollars, the receipt of which is hereby acknowledged, I, George E. Toner, by these present do sell, assign, and transfer unto Benjamin H. Sobelman the full and exclusive right, in and to the said invention, as described in the specification, executed by me on the 21st day of November, 1945, *preparatory to obtaining letters patent of the United States therefor;* said invention, application, and letters patent to be held and enjoyed by said Benjamin H. Sobelman, for his interest, for his own use and behoof, and for his legal representatives, to the full end of the term for which said letters patent may be granted as fully and entirely as same would have

been held by me had this assignment and sale not been made".[1] (Italics ours.)

28. On the same day, but subsequent to the execution of the above document, the application for letters patent was filed and the assignment recorded in the United States Patent Office.

29. All the promises and assurances with respect to entering into a future agreement fixing plaintiff's proportionate share in the profits to be derived from the exploitation of the grain trimmer and the protection of plaintiff's interest in the invention were professed by Sobelman with the intention that they would not be kept and for the sole purpose of inducing plaintiff to permit him to use the device and obtain title to the patent without payment.

30. In December of 1945, plaintiff, again attempting to pin Sobelman down, sought some assurance from him that in the event of the death of either of them, his interest in the profits would be protected. Sobelman summoned Stewart Tomkins, the auditor of the company, and stated that plaintiff had an interest in the device and that if anything were to happen to himself, he wanted Tomkins to see to it that plaintiff's interest was protected.

31. After considerable correspondence between plaintiff and Sobelman on the one hand and Sprout, Waldron & Co. on the other, the first model of the grain trimmer was constructed and delivered to B. H. Sobelman & Co. in the latter part of December of 1945. It was put into use at Girard Point, Philadelphia, the following month and found to be practical and a saver of time and money in loading ships with grain.

32. Reduced to its simplest terms, the device consisted of a hopper, a large flexible conduit, and an encased fan. The latter, when in motion, created a stream of air in the conduit of sufficient velocity to suspend and carry particles of grain, as they fell from the hopper, through and beyond the end of the conduit. This device could be lowered into the hold of a ship.

1. Compare with the Form in 2 Walker, Patents (Deller's Ed.), Appendix to chapter XIV, p. 1453.

33. Prior to the delivery of the mechanical grain trimmer, all the technical details concerning it were handled by the plaintiff, who kept Sobelman fully informed of the progress of its development. Sobelman disclaimed any knowledge of a responsibility for technical details concerning it.

34. The correspondence concerning the device was handled in the ordinary office routine. All outgoing letters were written on the stationary of B. H. Sobelman & Co., and carbon copies made in the accepted office practice; the letters signed by plaintiff were concluded with "B. H. Sobelman & Company, Stevedoring Department", and plaintiff's name followed. The incoming letters were handled in the usual course of business, routed to the proper person in the organization; some were addressed to Sobelman, some to B. H. Sobelman & Co. to the attention of plaintiff; some to plaintiff; and others to the company generally; some were never seen by the plaintiff; all, however, were placed in Sobelman's personal file.

35. On June 6, 1946, plaintiff, over a misunderstanding with Sobelman, left B. H. Sobelman & Co.

36. On June 28, 1946, plaintiff and his attorney attended a meeting arranged by Sobelman to discuss a matter concerning the patent with the patent attorney. Sobelman, upon being informed that plaintiff was accompanied by his attorney, became incensed and told plaintiff that since he was putting the discussion on a legal basis he had no interest in the invention. He added that he might have a moral obligation toward the plaintiff, but not a legal one.

37. During his association with B. H. Sobelman & Co. the plaintiff received from that company sums of money as follows: (a) 1943, Eighty Five Dollars ($85.00) per week, and a lump sum of Six Hundred Fifty Dollars ($650.00) at the end of the year; (b) 1944, Six Thousand Forty Dollars ($6,040) in weekly payments and a lump of Four Thousand Six Hundred Fifty Eight and 73/100 Dollars ($4,658.73); (c) 1945, Six Thousand Five Hundred Dollars ($6,500.00) in weekly payments and a lump sum of Five Hundred Dollars ($504.00) and Four Hundred Ninety-Six Dollars ($496.00); and (d) 1946, One Hundred Twenty-Five Dollars ($125.00) per week until he left the company. The Four Hundred Ninety Six Dollars ($496.00) was paid to him in May of 1946 at which time Tomkins told him that as of December 31, 1945, he was no longer a "partner" of the company. Plaintiff never obtained an accounting of the company's profits.

38. Defendants had the power to discharge plaintiff with or without cause, and to direct what work should be done by him and the manner of doing it. He never exercised any control over the policies of the company, nor was he a co-owner of its business. He was always considered and treated as an employee of the company.

39. At the present time there are at least fourteen models of the mechanical grain trimmer in existence. Some of them are being operated at Girard Point and Port Richmond, Philadelphia; a number of them have been transferred on a sale plus a royalty basis to concerns in Boston and New Orleans.

40. All expenses leading up to and the manufacture of the grain trimmers were borne by the defendants.

41. Beginning January 1, 1947, all the operations concerning the grain trimmers and title thereto were transferred to Sobelman Enterprises, Inc.

42. Plaintiff has never received any money from the defendants for the part played by him in connection with the grain trimmers.

43. The parties have never entered into an agreement fixing the proportionate share that the plaintiff is to receive in the profits derived and to be derived from the use, lease, or sale of the grain trimmers.

44. On January 10, 1947, he brought this action.

45. A description of the mechanical grain trimmer and proof, or an admission by defendants to that effect, that it was a trade secret, not appearing on the record, this court, relying on Macbeth-Evans Glass

Co. v. Schnelbach, 239 Pa. 76, 87, 86 A. 688; Quaker State Oil Refining Co. v. Talbot, 315 Pa. 517, 528, 174 A. 99; Pittsburgh Cut Wire Co. v. Sufrin, 350 Pa. 31, 34, 38 A.2d 33, ordered the action held in statu quo until a patent issued.

46. On August 10, 1948, patent No. 2,446,968 was issued to Sobelman for the invention relating to an improvement in grain trimmers. Plaintiff was designated therein as the inventor and the assignor. The form of the construction of the grain trimmer shown in the specification was substantially the same as that conceived and developed by plaintiff prior to his employment with B. H. Sobelman & Co. The cost of obtaining the patent was borne by the defendants.

47. On October 1, 1948, this court issued an order enjoining the defendants from conveying any interest in patent No. 2,446,-968, until further order of this court. The failure of this court to enter such an order would cause irreparable injury to the plaintiff if he were to ultimately prevail in this action.

### Conclusions of Law:

1. This court has jurisdiction of the parties and the subject matter of this action.

2. During his association with B. H. Sobelman & Co., plaintiff was an employee of that company; the remuneration received from it constituted wages.

3. Plaintiff was not employed to invent devices to aid in the loading or unloading of cargo vessels; nor did his employment contract require him to assign any invention or the patent therefor which he had conceived or might conceive and be reduced to practice during his employment.

4. A shop right in the mechanical grain trimmer did not arise.

5. Plaintiff is entitled to a proportionate share of the profits derived and to be derived from the exploitation by the defendants of the mechanical grain trimmers embodying the invention in Patent No. 2,446,-968. If the parties can not agree as to the proportionate share which plaintiff is to

receive, this court will fix a date to determine the same.

6. The promise to protect plaintiff's interest in the invention and the patent to be issued therefor made by Sobelman to induce plaintiff to assign his interest in the invention to him was a misrepresentation of an existing fact and consisted of fraud.

7. Unless he reassigns a half interest in the patent to plaintiff and he agrees to exploit the grain trimmers with reasonable diligence, Sobelman is required to assign the entire right in Patent No. 2,446,968 to plaintiff.

8. Plaintiff is entitled to have a special master appointed to determine the amount of profits derived from the exploitation of the mechanical grain trimmers. The fee of the special master and his costs to be paid by the defendants.

9. Defendants are required, at reasonable intervals of time, to account for future profits derived from the exploitation of the mechanical grain trimmers.

10. All costs of the suit are to be assessed against the defendants.

### Discussion:

The law to be applied here is the substantive law of Pennsylvania. Although the right to a patent is here involved, the action does not arise under the laws of the United States, and the jurisdiction is clear, solely because of diversity of citizenship, hence the applicable rule of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487.

Pennsylvania recognizes a species of license referred to as a "shop right". Slemmer's Appeal, 58 Pa. 155, 167, 98 Am. Dec. 248 Dempsey v. Dobson, 174 Pa. 122, 34 A. 459, 32 L.R.A. 761, 52 Am.St.Rep. 816. A shop right, with reference to the employer-employee relationship, is an implied irrevocable, non-assignable, non-exclusive license of an employer to use in his business, without paying for its use, a trade secret created, discovered or invented by his employee[2]. The mere fact that the

2. Whether the license also includes the privilege of making and selling the trade secret depends on a number of factors. As stated in Flannery Bolt

trade secret is discovered, perfected or invented during the employee's hours of employment does not give rise to a shop right, there must be conduct on the part of the employee which will estop him from denying such license. Neon Signal Devices, Inc., v. Alpha-Claude Neon Corporation, D.C., 54 F.2d 793.

A shop right does not include the right to the patent issued or to be issued for an invention. The circumstances which give rise to the shop right are not sufficient to divest the employee of his right to the patent. That right belongs to and is retained by the employee until contracted away by him. United States v. Dubilier Condenser Corp., 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114, 85 A.L.R. 1488; American Cyanamid Co. v. Hubbell, 3 Cir., 76 F.2d 807. However the employer may by contract obtain title to the patent where the employee sells in advance the fruits of his talent. Solomons v. United States, 137 U.S. 342, 11 S.Ct. 88, 34 L.Ed. 667; Quaker State Oil Refining Co. v. Talbot, 315 Pa. 517, 174 A. 99.

The defendants in their answer admitted that during the time the plaintiff was with B. H. Sobelman & Company, he was an employee of that company. However, at the trial, they contended that by virtue of his signing the "Memorandum of Partnership" on February 11, 1944, plaintiff was a partner of that company. Since the respective rights and obligations of the parties flow from whether or not he was a partner or employee, it must be determined at the outset what the capacity of the plaintiff was in his association with the defendants.

Section 11 of the Uniform Partnership Act[3] defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit."

Therefore it is a requisite of a partnership that there be co-ownership of the business, as distinguished from the assets, by the persons constituting the partnership. Provident Trust Co. of Philadelphia v. Rankin et al., 333 Pa. 412, 5 A.2d 214. After thoroughly considering all the facts and circumstances, the conclusion is reached that the relationship here obtaining is one of employer and employee and that the money received by the plaintiff was wages during his entire stay with the company, and the fact that the wages for a time may have depended on the net profits of the company did not alter his status. Frazier v. Mansfield, 305 Pa. 359, 157 A. 798; Schuster v. Largman et al., 308 Pa. 520, 162 A. 305; City of Wheeling v. Chester et al., 3 Cir., 134 F.2d 759. His signing of the partnership memorandum had a similar effect. However, as has been here above indicated, the mere existence of the employer-employee relationship coupled with the factors that the trade-secret was put to practice in the employer's business, and the expense of its manufacture was defrayed by the employer, will not in the face of an understanding to the contrary, give rise to a shop right. Independent of any patent right, an express promise on the part of Sobelman to pay the plaintiff a proportionate share of the profits to be derived from the use of the grain trimmer was made out by the evidence. Defendants seek to avoid payment because an agreement as to the exact proportion that the plaintiff was to share in the profits was never reached. However, Pennsylvania courts will put contract niceties aside, and will enforce a promise to pay for the use of the invention despite the fact that such promise is indefinite as to amount.[4] White Heat Products Co. v. Thomas, 266 Pa. 551, 557, 109 A. 685.

Co. v. Flannery, 3 Cir., 86 F.2d 43, at page 44: "The scope of a shop right must be determined from the nature of the employer's business, the character of the invention involved, the circumstances which created it and the relation, conduct, and intention of the parties".

For a discussion of the rights to inventions as between employer and employee, see annotation in 16 A.L.R. 1177, supplemented by 32 A.L.R. 1037; 44 A.L.R. 593; 85 A.L.R. 1512; 153 A.L.R. 983.

3. Act of March 26, 1915, P.L. 18, Sec. 6, 59 P.S. § 11.

4. Also see comment note, 170 A.L.R. 449, 495–498 and cases cited in foot note 19.

 Accordingly, and unless there is a valid expressed assignment transferring the plaintiff's interest in the patent to him, Sobelman is not entitled to it. Section 4895 of the Revised Statutes, 35 U.S.C.A. § 44, provides: "Patents may be granted and issued or reissued to the assignee of the inventor or discoverer; but the assignment must first be entered of record in the Patent Office." This does not mean that the assignment must be recorded before legal effect will be given to it; state law may provide that the assignment, whether oral or written, may be valid and enforceable at an earlier time. Dalzell v. Dueber Watch-Case Mfg. Co., 149 U.S. 315, 13 S.Ct. 886, 37 L.Ed. 749. Revised Statute § 4898, as amended, 35 U.S.C.A. § 47, provides: "Every application for patent or patent or any interest therein shall be assignable in law by an instrument in writing, and the applicant or patentee * * * may * * * grant and convey an exclusive right under his application for patent or patent to the whole or any specified part of the United States." It is not to be understood by this section that the assignment must be in writing and so recorded in order to pass legal title to the application. It would seem that where the provisions of the section have been complied with, and all the other conditions, not in conflict with the patent law, imposed by the state for a valid assignment are met that state may not declare that the assignment does not convey legal title to the patent therein. The only way, however, that an assignee of the inventor may require the Patent Office to issue the patent to him or prevent intervening rights of bona fide purchasers, is to comply with R.S. § 4895. So, as a practical matter, whatever the state law is on the subject, an assignee will insist that the assignment to him be in writing in order that it may be recorded in the proper place. R.S. § 4898, as amended, contemplates that at the time of the assignment of an application for a patent, the application must have been filed or pending in the Patent Office. Scott Paper Co. v. Marcalus Manufacturing Co., Inc., 326 U.S. 249, 254, 66 S.Ct. 101, 90 L.Ed. 47; Owen v. Paramount Products, Inc., D.C., 41 F.Supp. 557, 560. In the case here, the assignment was executed prior to the filing of the application in the Patent Office. Therefore, state law, to which we must refer, may, but need not, provide that legal title passed notwithstanding full compliance with the patent law had not been made. "Whether a conveyance of a chattel which is in due form and is made by a party who has capacity to convey it is in other respects valid, is determined by the law of the state where the chattel is at the time of the conveyance". Restatement, Conflict of Laws, (1939) Sec. 257. Where equitable relief is sought, the law of the forum governs as to the form of relief which will be given. Guaranty Trust Co. of N. Y. v. York, 326 U.S. 99, 105–107, 65 S.Ct. 1464, 89 L.Ed. 2079, 160 A.L.R. 1231; Campbell Soup Company v. Wentz, 3 Cir., 1948, 172 F.2d 80.

 An invention, for patent purposes, is considered as involving a mental conception or idea and its embodiment in some physical form reduced to practice, actually or constructively[5] Traditionally it has been thought of as an intangible existing independent of law and the tangible form which embodies it[6]. Beale, Conflict of Laws (1937) Secs. 8A.18, 51.1. A Pennsylvania Court, we feel, would find preliminarily that an invention, for conflict of laws purposes at least, is an intangible; also that the principal events concerning the making of the assignment which is relied upon as transferring the patent rights for the improvement in grain trimmers occurred in the District of Columbia. We therefore refer to the substantive law of that jurisdiction, wherein its common law except as modified by statute is still in full force and effect[7]. Mead

5. 1 Walker, Patents (Deller's Ed.) Sec. 23.

6. A similar view was taken with respect to a copyrighted article in Stevens v. Gladding & Proud, 17 How. 447, 58 U.S. 447, 15 L.Ed. 155.

7. Acts of February 27, 1801, 2 Stat. 103, ch. 15, Sec. 2, and March 3, 1901, 31

v. Phillips, 1943, 77 U.S.App.D.C. 365, 135 F.2d 819, 824-825, 147 A.L.R. 322. Whether an assignment of an application for a patent not then filed or pending in the Patent Office conveys, by the law of the District of Columbia, legal or equitable title to the application we need not determine. But see Ellis, Patent Assignments, 2d Ed., Secs. 71-81. For the assignment, made and signed by the plaintiff on November 23, 1946, besides purporting to transfer title to the application for patent not then filed or pending, states that all his rights in the invention are transferred to Sobelman.

▮▮▮ Prior to the filing of an application for patent, legal title to a completed invention may be transferred by assignment. Cammeyer v. Newton, 94 U.S. 225, 24 L.Ed. 72; Crowell v. Gould, 68 App.D. C. 297, 96 F.2d 569 (specific performance of agreement to assign an invention denied because indefinite and uncertain); Runstetler v. Atkinson, 11 D.C. 382. In addition to his common law rights, an inventor has the inchoate privilege, given by R.S. § 4888, 35 U.S.C.A. § 33, to file an application for a patent of his invention. Hendrie v. Sayles, 98 U.S. 546, 25 L.Ed. 176, 179. Also see Gayler v. Wilder, 10 How. 477, 13 L.Ed. 504. A transfer by the inventor of his entire interest in his invention to another, unless an intention to the contrary appears, carries with it the inchoate privilege to file an application for a patent and the right to require the inventor to sign the application. Philadelphia, W. & B. Railroad Company v. Trimble, 10 Wall. 367, 379-380, 77 U.S. 367, 379-380, 19 L.Ed. 948; Popp v. Newport News Shipbuilding & Dry Dock Co., 3 Cir., 5 F.

2d 962; Emmons v. Sladdin, C.C.Mass., 8 Fed.Cas. page 681, No. 4,470; M. J. Lewis Products Co. v. Lewis, D.C.E.D.Pa., 57 F.2d 886. Assuming, without so deciding, that ten dollars is adequate consideration, the assignment, on its face, conveyed to Sobelman all of plaintiff's title and interests in the invention and the privilege to obtain letters patent therefor. This is the barrier which plaintiff must hurdle before any relief may be granted him with respect to the patent.

▮▮▮ Alleging fraud on the part of Sobelman and reliance thereon, plaintiff introduced at the trial, without objection from defendants, evidence to show that he made and executed the assignment because of such fraud[8]. Relying upon Pennsylvania authorities[9], defendants claim that fraud of the nature provided in the so-called parol evidence rule was not proved. The District of Columbia also has a parol evidence rule and criterion for determining fraud. Pennsylvania characterizes a rule of that nature as substantive, and under the circumstances would refer to the rule of the District of Columbia. Jeter v. Fellowes, 32 Pa. 465; Musser v. Stauffer, 192 Pa. 398, 405, 43 A. 1018; Cooke v. Addicks, 6 Pa.Super. 115. We must do likewise. Long v. Morris, 3 Cir., 128 F.2d 653, 141 A.L.R. 1041; McDonnell v. General News Bureau, 3 Cir., 93 F.2d 898.

▮▮▮ The rule in the District of Columbia was to the effect that in the absence of proof of fraud, accident or mistake, extrinsic evidence is inadmissible to vary or contradict the terms of a written contract. This rule has been broadened to conform to the views long advocated by an

---

Stat. 1189. By these organic acts, the laws of the District of Columbia consist of the principles and maxims of equity as they existed in England and in the colonies in the year 1776, statutes of the British Parliament in effect in the colonies in 1776, and which were not locally inapplicable, all the laws of the legislature of Maryland from 1776 to 1800 and the common law of Maryland. See Historical Note to Title 1, page IX of the District of Columbia Code (1940).

8. "One who has been induced to enter into a contract by false and fraudulent repre-

sentations may rescind the contract; or he may affirm it, keeping what he has received under it, and maintain an action to recover damages he has sustained by reason of the fraud * * *." Wyatt v. Madden, 59 App.D.C. 38, 32 F.2d 838, 839.

9. Gianni v. R. Russell & Co., 281 Pa. 320, 126 A. 791; First National Bank of Hooversville v. Sagerson, 283 Pa. 406, 129 A. 333; Berardini v. Kay, 326 Pa. 481, 192 A. 882; Henry, Pennsylvania Trial Evidence, p. 535.

eminent authority on evidence. Those views are set forth in 9 Wigmore, Evidence, 3d Ed., Sec. 2400 et seq. Authority for this change is Mitchell v. David, D.C. Mun.App., 51 A.2d 375. Unless otherwise inadmissible by some local rule of evidence, all evidence concerning the document relied upon as representing the entire contract between the parties is admissible to ascertain whether in fact the parties to the contract intended the document to constitute an integration of their entire agreement.

Our problem is to determine whether the extrinsic evidence, if believed, constituted fraud, and if not, to what extent, if any, that evidence should be given legal effect. That evidence clearly, convincingly and unequivocally showed that plaintiff made and executed the assignment in reliance upon the following material representations. One, Sobelman's reassurance that plaintiff would share in the profits to be derived from the exploitation of the grain trimmers, and that if the patent were in Sobelman's name, the manufacture of the devices could be expedited and profits come into being sooner. Two, Sobelman's promise that he would protect plaintiff's interest in the invention, which the latter understood to include the patent. Besides our holding that plaintiff is entitled to share in the profits, there was no proof that the manufacture of the devices would not have been accelerated by the patent being in Sobelman's name. Following the maxim that equity considers done that which ought to be done, the intent of Sobelman when he reiterated the profit sharing promise can not be grounds for fraud. All that remains is Sobelman's promise to protect plaintiff's interest in the invention with the intention not to so do. Under the circumstances did such a promise constitute a misrepresentation of an existing fact by the law of the District of Columbia? In Height v. Richmond Port Improvement Co., 1918, 47 App.D.C. 518, at page 534, the court held: "* * * where one promises to do a certain thing, having at the time no intention of keeping his agreement, it is a fraudulent misrepresentation of a fact, and actionable as such". This was the law when the District was but thirty-nine years old. Fenwick v. Grimes, C.C.D.C.1839, 8 Fed.Cas. page 1144, No. 4,734. For dicta apparently to the contrary, see Jackson & Sharp Co. v. Fay, 1902, 20 App.D.C. 105; Baker v. Baker, 1924, 54 App.D.C. 214, 296 F. 961, 964. We have found no case expressly or impliedly overruling the Height case or sustaining the dicta in the Fay and Baker cases. We hold, therefore, that at the present time, the majority rule [10] stated in the Height case is the law in the District of Columbia. This is also the rule in the State of Maryland. Councill v. Sun Insurance Office of London, 1924, 146 Md. 137, 126 A. 229, 51 A.L.R. 29; Gale v. McCullough, 1912, 118 Md. 287, 84 A. 469. It follows that plaintiff was induced to assign his invention to Sobelman because of the latter's fraud.

[32, 33] Plaintiff's remedy at law being inadequate, some form of equitable relief would appear to be in order. He asks for reassignment of the patent. We think justice would be better served by requiring Sobelman, unless he reassigns a half interest in the patent to plaintiff and agrees to exploit the grain trimmers with reasonable diligence, to reassign the entire right in the patent to plaintiff.

Plaintiff may prepare a decree in accordance with the conclusions here reached.

10. See note, The Legal Effect of Promises Made With Intent Not to Perform, 38 Columbia L.Rev. 1461 (1938); case note 13 Rocky Mt. L.Rev. 263 (1940); and annotation in 51 A.L.R. 46, 63 (1927), supplemented by 68 A.L.R. 635, 637 (1930); 91 A.L.R. 1295, 1297 (1934); 125 A.L.R. 879, 881 (1940).