## A.B.L. Liquidating Company v. McCabe

*Robert F. Ruehl, Power, Bowen & Valimont, Morris R. Brooke* and *Joseph C. Bright, Jr.,* of *Drinker, Biddle & Reath,* for plaintiff.

*William H. Eastburn, 3rd,* of *Eastburn & Gray,* for defendant.

LUDWIG, J., April 27, 1973.—This equity action is before us for adjudication following two evidentiary hearings in 1972. The complaint was filed by plaintiff, Air Balance, Inc.,[1] in 1968 to enforce an agreement of employment with defendant, Francis J. McCabe, an

---

[1] Plaintiff, a Pennsylvania corporation, changed its name in June 1970, to A.B.L. Liquidating Company.

employe from 1962 to 1965. It sought an injunction restraining McCabe from divulging confidential information to plaintiff's competitors in the louver and air damper manufacturing and sales business, and claimed damages.

In the course of working for plaintiff, originally under an oral understanding, McCabe had devised and invented improvements to two of its existing products, a fire damper and a back draft damper.[2] These improvements were patented and defendant's interest assigned by him to plaintiff while the employer-employe relationship was still subsisting. But thereafter, according to the complaint, defendant disclosed the inventions to other companies, conspired with them to establish the invalidity of the patents, and required plaintiff to protect its rights through costly patent litigation, all in alleged violation of a written agreement of employment with plaintiff entered into in February of 1965.

Defendant's counterclaim asserts plaintiff's breach of two oral stock option agreements and of a sales agency agreement. It seeks a decree of specific performance as to the stock option or, as alternative relief, the nullification of the patent assignments, an accounting for profits, plus damages for breach of the sales contract and for interference with defendant's relations with other companies.

At the hearings before the chancellor, plaintiff narrowed its claim to special damages of $38,483.68, being the amount of attorney's fees alleged to have been expended in its pursuit of patent protection. Also, de-

---

[2] A fire draft damper is a mechanical control device designed to inhibit the spread of fire in air conditioning systems by obstructing the duct work. A back draft damper is a device designed to regulate the reverse flow of air at the exterior opening of a ventilation system. This mechanism is also known as an aerodynamic shutter.

fendant apparently dispensed with his claim for business interference. The general issues are framed by the parties' remaining claims for relief, and the chancellor finds the facts to be as follows:

In July of 1962, plaintiff was having difficulty with the mechanical performance of its louvers and dampers. It hired defendant, an engineering student, who had 120 course credit hours at Drexel University, to construct a wind tunnel in which to test the efficiency of its products. Within a few weeks, his employment was enlarged to include the development and engineering of product improvements, in particular, the fire damper and the back draft damper. Plaintiff needed the services of a design engineer, and that would be an apt description of defendant's employment. He was informed by the president of the company and by the sales manager that both products could be functionally enhanced by the opening of the airstream. It was suggested to him that he experiment with a damper working on the principle of a hinged blade, or so-called piano hinge. In his inventions, using company time and material, McCabe succeeded in doing so.

As the result of these inventions, Air Balance became the only company in its field to have a folding blade damper. On November 22, 1963, defendant applied to the United States Patent office for a patent on an improvement to the back draft damper and on that date assigned his interest in that invention to his employer. On June 17, 1964, he applied for a patent on an improvement to the fire damper. In the period 1963, he was made a vice president and director of plaintiff and given a raise from $8,000 to $15,000 per year plus an expense account. He was put in charge of production, product design and research and development. On January 15, 1965, he filed a patent applica-

32

tion for the construction method of the fire damper improvement and on that day assigned to plaintiff both his interest in this invention and in the earlier application covering the improvement itself. However, he had already executed an assignment to plaintiff of the same improvement on September 22, 1964.[3]

In 1964 and early 1965, he repeatedly requested an option for 20,000 shares of plaintiff's stock from the board of directors. He had been notified by a letter in 1963 from the company's counsel that the directors would consider granting him a 3,500 share stock option.[4] The board of directors, however, and he was at all of these times a member, never voted upon any such stock option proposals. Nor did anyone acting for Air Balance represent to him at any time that he was to receive a stock option other than conditioned upon board approval.

On February 20, 1965, he executed the writing on which this suit is brought, entitled "Employee's Agreement," which required him ". . . to preserve as confidential information of Air Balance, Inc. all inventions . . . made or conceived by me . . . from the time of entering [its] employ until the termination thereof . . ." as related to his employer's manufacturing busi-

---

[3] This was elicited on cross-examination of defendant, who apparently had forgotten having made the earlier assignment. The counterclaim avers that the assignments of January 15, 1965, were executed in reliance upon a promise from the president of plaintiff made in the presence of the board of directors to give defendant the 20,000 share stock option. Our finding is to the contrary, that there was no such promise or reliance.

[4] Under the terms of this proposed option, McCabe would have been required to purchase 750 shares by December 1963; 1,750 shares by December 1964; and 1,000 shares by December 1965, at $1 per share, none of which did he purport to do. Defendant's counterclaim inadvertently refers to 3,600 shares instead of 3,500, which is the correct figure.

ness. This agreement, however, also provided ". . . that all inventions which I made prior to the date of this Agreement are excluded from the scope of this agreement." It is executed under seal with a declaration that the signatories intended to be legally bound thereby. But no change occurred in defendant's employment status or in any emoluments that he was to be paid. Three months later on May 13, 1965, having, inter alia, not received the stock option, he submitted his resignation as an officer and director of plaintiff. In May 1965, he entered successively into two or more written sales agent agreements with plaintiff, the last on May 17, 1965, but none of these arrangements was performed on either side.

On May 28, 1965, he visited Ruskin Manufacturing Company, Grandview, Missouri, a competitor of plaintiff, and in July 1965, entered into a written agreement to sell Ruskin his interest in a folding blade type of fire damper. He had devised a different folding blade mechanism from his previous invention and was in the process of applying to have it patented. At first, he had advised Ruskin to acquire a license of the patent held by Air Balance but he then invented another folding blade mechanism. In 1967, however, Air Balance obtained a consent decree in a Federal district court in which Ruskin agreed to cease and desist from manufacturing such folding blade products and transferred to Air Balance a portion of the patent assigned to it by McCabe.[5]

---

[5] McCabe's employment with Ruskin was of short duration. By letter of January 24, 1966, having worked for another company after Ruskin, he wrote to his next employer, M. & T. Engineering Company, of Chicago, in care of two persons, one of whom was Samuel S. Metti. In that letter he wrote: ". . . if we decide to sue Air Balance for the 20,000 shares or the patent then it will become M. & T. Engineering Project—I do not intend to personally sue Air Balance. I started this with the idea to back off and accept just

The claims for relief asserted on both sides of this long-standing litigation are, as we view them, all without merit. Plaintiff's claim for damages in the nature of lawyer's fees expended to enforce the parties' employment contract is not actionable for three reasons. First, as attorney's fees they are, as a general rule, not legally cognizable in Pennsylvania, and there is no applicable exception that would preserve them in this case.[6] Second, the employment contract is unenforceable in equity, as being against public policy, for it is neither ancilliary to the employment status nor supported by consideration.[7] E.g., Capital Bakers, Inc. v. Townsend, 426 Pa. 188, 191 (1967), and cases cited. Third, we are not persuaded that plaintiff has,

---

the release from my contract. . . ." On October 28, 1970, Samuel S. Metti, having become president of A.B.L. Liquidating Company, took the verification to plaintiff's amended reply to new matter, in the present action against McCabe.

[6] "There can be no recovery for counsel fees from the adverse party to a cause, in the absence of express statutory allowance of the same . . . or clear agreement by the parties . . . or some other established exception": Corace v. Balint, 418 Pa. 262, 271 (1965).

[7] Plaintiff argues that because of the restriction of its claim at the hearing stage to damages, the contract is governed by principles at law, citing Community Sports, Inc. v. Denver Ringsby Rockets, Inc., 429 Pa. 565, 574, fn. 5 (1968) and Krauss v. M. L. Claster & Sons, 434 Pa. 403, 408 (1969). At law, the employment contract being under seal and qualifying under the Uniform Written Obligations Act would not be unenforceable for lack of consideration. Nonetheless, this action, untransferred, remains in equity, and we know of no authority for determining it as though it were being heard at law. What is more, the compensation that plaintiff seeks, the reimbursement of attorney's fees, even if cognizable as damages, flows directly and is inseparable from the enforceability of the employment contract as an exercise of equity's injunctive power. It would be an anomalous result to permit damages at law for the cost of engaging in litigation to enforce a contract declared, according to equitable principles, to be unenforceable.

in any event, borne its burden of proving that under the law and the facts, it is entitled to recovery for breach of the loyalty and nondisclosure covenants of the contract. Defendant's position that only future, not prior or earlier, inventions are subject to the contract, is at least arguably supported by the contract's exclusionary provision. Moreover, even if its covenants are deemed to cover the folding blade inventions of 1963-64, we did not find the weight of the evidence to have substantiated plaintiff's factual contention as to disloyalty on the part of the defendant. Here, evidence of a consent decree entered into by two of defendant's former employers raised too many collateral considerations to be dispositive of this issue, and weighing defendant's testimony we are not convinced by a preponderance. On this finding alone, plaintiff's claim for breach of contract must be dismissed.

Defendant's counterclaim for a rescission of his patent assignments also must fail. The law is clear that where an employe is hired for the particular purpose of obtaining his inventive skill and ingenuity for the benefit of his employer, an invention developed by him in the course of his work shall be his employer's property even though his contract does not expressly require his making an assignment. In Pennsylvania, this rule was upheld in the single instance in which it was considered: Quaker State Oil Refining Companies v. Talbot, 315 Pa. 517, 523 (1934). See Restatement 2d, Agency §397, comment (a) (1958). Also, see Annotations, Right to inventions as between employer and employee, 153 A.L.R. 983 (1944), and Application and effect of "shop right rule" or license giving employer limited rights in employees' inventions and discoveries, 61 A.L.R. 2d 356 (1958). In Quaker State Refining Company, supra, it was applied to an oral contract of employment, where the purpose was de-

velopment of an improvement to an existing product. In the present case, the evidence is unequivocal that shortly after he began working for Air Balance and well before defendant came forth with the ideas for his inventions, he was specifically instructed by his employer to find a way to improve the fire and back draft dampers. This, he understood to be part of his job. At no time in his employment did the parties evince that the inventions were other than Air Balance's property, and, thereafter, when he went to Ruskin, his first suggestion was that it license the patents from his former employer.

Defendant contends that this is not a case where the employer would be entitled to its employe's inventions because the parties' agreement contemplated product development only generally and not specifically and not at the outset of defendant's employment. At most, he says, the employer is entitled to a non-exclusive "shop right." The facts, as we determined them, were completely to the contrary.

Defendant's alternative claim, for enforcement of 20,000 and 3,500 share stock options, cannot prevail because of two objections. Defendant did not prove that any stock option was granted him by plaintiff through anyone acting or purporting to act with authority, or that the statute of frauds barring enforcement of oral stock options was, in the circumstances, overcome: Act of October 2, 1959, P. L. 1023, §8, 12A PS §8-319. According to the evidence, the board of directors of plaintiff never acceded to defendant's request for the stock option, but instead continually refused to act on the matter. Defendant testified that he was "promised" the stock by corporate officers and directors, but also admitted to being present at the directors' meetings and to knowing that no one was

so authorized. The testimony of plaintiff's then president and majority shareholder was that he promised defendant his vote in favor of the 20,000 share stock option but only on the condition that the other directors were agreed. The letter relating to 3,500 share proposal also made board approval the prerequisite. They persisted, according to this witness, in refusing to part with a right to stock. We credited this testimony.

Defendant argues that his assignment of the patent applications on January 15, 1965, satisfied the requirements of the statute of frauds, being a partial performance of a stock option agreement for 20,000 shares. Here, too, we disagree. As already discussed, the defendant had no equity in the patents nor any right to withhold the assignments. In law, these could not constitute a partial performance. Moreover, they were not, as we viewed the evidence, given in return for the promise of stock and did not factually qualify as partial performance.

The second alternative counterclaim was for damages for breach of a territorial sales contract. This claim is not discussed in defendant's brief, but we are not aware whether it has been abandoned. It cannot succeed, however, first because it was completely supplanted by a later contract, and, second, defendant has not established that there was an actionable breach committed by plaintiff.

The contract relied upon by defendant is dated May 6, 1965. According to the counterclaim, this was the sole sales contract upon which he was seeking damages. Plaintiff, however, put into evidence a sales contract dated May 17, 1965, also executed by the parties, which by its terms cancelled all previous sales understandings and agreements between them. Defendant while admitting to having entered into this

second contract, offered no explanation for it, or any theory upon which he could recover under the earlier, cancelled contract.

Defendant's evidence included a handwritten agreement, undated, signed by defendant and by plaintiff's president, purporting to guarantee defendant that plaintiff would not raise its prices during the pendency of the sales agreement with him. Defendant testified that this document did not accompany or pertain to the May 6, 1965, agreement but one of the later agreements, which he did not identify. His testimony was that on May 21, 1965, plaintiff raised its prices, and this was corroborated by a memorandum apparently sent out to all sales agents. It was for this reason, he stated, that he left plaintiff and considered it to have broken its sales contract with him. However, this claim is vague, unclear and not substantiated by the evidence.

Accordingly, we enter the following conclusions of law:

1. The court has jurisdiction in equity over the subject matter and the parties.

2. The parties' employment agreement dated February 20, 1965, was not violated by defendant.

3. The damages sought by plaintiff being attorney's fees are not cognizable in this case.

4. The employment agreement is unenforceable in equity, and the damages plaintiff seeks are directly derived from its enforceability in equity and, hence, are not actionable.

5. Defendant is not entitled to rescission of his assignments of the three patent applications to plaintiff, since under the terms of his employment he had and has no interest in them.

6. Defendant is not entitled to a stock option for 20,000 shares or for 3,500 shares of plaintiff's stock,

since no binding promise was given him and his claim is unenforceable by reason of the statute of frauds governing stock options.

7. The existence of a valid and subsisting sales agency agreement between the parties was not established.

## DECREE NISI

And now, April 27, 1973, plaintiff's claim for damages is denied. Defendant's counterclaim for specific enforcement of the stock options, rescission of the patent assignments and for an accounting for profits, and other damages, are likewise denied.

The prothonotary is directed to notify counsel of the date of the filing hereof, and, if exceptions are not filed within 20 days after such notification, this decree nisi shall, upon praecipe, be entered as a final decree, pursuant to Pennsylvania Rules of Civil Procedure 1517(b) and 1519(a).